UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BARBARA REYNOLDS,<br>    *Plaintiff*,<br><br>    v.<br><br>TOWN OF SUFFIELD *et al.*,<br>    *Defendants.* | Civil No. 3:10cv1528 (JBA)<br><br><br>July 31, 2012 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Barbara Reynolds filed suit against Defendant Town of Suffield, Michael Manzi, Chief of the Suffield Police Department, former First Selectman Donald Miner, Chairman Scott Lingenfelter, former Captain David Bourque, Sergeant Robert Brown, and Human Resource Director Joyce Feeney, alleging sex and pregnancy discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, violations of the Americans with Disabilities Act, 42 U.S.C. § 12293, and the Rehabilitation Act of 1973, 29 U.S.C. § 794, and unlawful retaliation in violation of Connecticut General Statutes § 31–51q. Defendants move [Doc. # 37] for summary judgment on all claims. For the reasons discussed below, Defendants' motion will be granted.

I.      Factual Background[1]

Plaintiff Barbara Reynolds began working as a police officer for the Suffield Police Department in March 2006. In July 2008 Ms. Reynolds requested, and was granted, a medical leave of absence. (*See* Pl's Dep., Ex. A to Def.'s Loc. R. 56(a)1 Stmt at 34.)

   A.      Off–Duty Incidents

On July 27, 2008, while Plaintiff was on medical leave, Julia Marsh, Plaintiff's sister, called the police one evening while Plaintiff was over at her home to report that Plaintiff was out of control (Ex. H to Def.'s Loc. R. 56(a)1 Stmt at 1.) When the State troopers arrived, they reported that Plaintiff was resistant to any assistance from the troopers, though she was eventually transported by ambulance to Windham Hospital. (*Id.* at 2–3.)

The Connecticut State Police contacted Suffield Police Department after this incident to discuss Plaintiff's behavior. (*See* Pl.'s Dep. at 49; Deposition of Chief Manzi, Ex. B to Def.'s 56(a)1 Stmt at 143–44.) Ms. Reynolds was not disciplined for the incident, (*see* Pl.'s Dep. at 56; Manzi Dep. at 18, 55, 60), returned to work full–duty in November 2008, and was assigned to work evenings based on the seniority bid cycle. (Pl.'s Dep. at 34, 36, 59.)

---

[1] Plaintiff's Local Rule 56(a)2 Statement [Doc. # 52] does not conform to Local Rule 56(a)3, which provides in pertinent part: "each denial in an opponent's Local Rule 56(a)2 Statement[ ] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. The affidavits, deposition testimony, responses to discovery requests, or other documents containing such evidence shall be filed and served with the Local Rule 56(a)1 and 2 Statements in conformity with Fed. R. Civ. P. 56(e)." When denying statements of fact, Plaintiff's Loc. R. 56(a)2 Statement makes no citation to portions of the record that would support her denials. "[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1." D. Conn. Loc. R. 56(a)3. Thus, as Defendants have cited to facts that are supported by evidence in the summary judgment record, such facts are deemed admitted.

On Friday, February 20, 2009, Ms. Reynolds called in sick to work, citing "female–related issues." (*Id.* at 88, 89:11–12; Deposition of Captain Bourque, Ex. E to Def.'s 56(a)1 Stmt at 61:24–25.) Ms. Reynolds testified that she thought she was pregnant, she was not feeling well, and she went to the doctor earlier in the day to get a pregnancy test. (Pl.'s Dep. at 89:2–10.) During what would have been her scheduled evening shift at work, Ms. Reynolds went out with her boyfriend David Stearns for drinks and dinner. (*Id.* at 64–65.) Later in the evening, after Plaintiff and her boyfriend had left the restaurant, Mr. Stearns ended up calling 911 and reporting that Ms. Reynolds was "out of control." (Feb. 20, 2009 Incident Report, Ex. I to Def.'s 56(a)1 Stmt at 1.)

When the troopers arrived, they found that Ms. Reynolds was "visibly intoxicated." (*Id.* at 2–3.) Ms. Reynolds's sister agreed to take her home for the night, and on her way to her sister's car, Plaintiff called the trooper who wrote up the incident report "a lousy f[. . .]ing cop" and a "f [. . .] ing asshole," and extended her middle finger at him. (*Id.* at 3.) Ms. Reynolds did not report this incident to the Suffield Police Department, but the Connecticut State Police did. (*See* Manzi Dep. at 70–71, 144–45; Nelson Memo, Ex. J to Def.'s 56(a)1 Stmt.)

      B.      Internal Affairs Investigation and Pregnancy

The Police Department commenced an internal affairs ("IA") investigation into the February 20, 2009 incident. (Pl.'s Dep. at 69; Manzi Dep. at 74–75.) Chief Manzi testified that he ordered this IA investigation because this was Ms. Reynolds's second off–duty incident involving "bizarre behavior" and profanity towards the investigating State troopers, and that the second incident occurred during an evening when Plaintiff was supposed to be at work, but had called in sick. (Manzi Dep. at 80:2–7.) Sergeant Van Tasel, Ms. Reynolds's

immediate supervisor, was assigned to be the investigating officer. (Pl.'s Dep. at 70; Manzi Dep. at 78:6–14.) Ms. Reynolds was notified of the IA investigation on March 7, 2009 (Mar. 7, 2009 Notification of Investigation, Ex. K to Def.'s 56(a)1 Stmt), and that same day she provided the Department with a written statement concerning the off–duty incident.

Ms. Reynolds learned that she was pregnant on March 23, 2009, which was confirmed by a doctor's note which Plaintiff submitted when she arrived at work on March 26. (*See* Pl.'s Dep. at 106:1–3.) Ms. Reynolds explained to Captain Bourque and Chief Manzi that her doctor told her that she had a 20–pound lifting restriction, and that she could not work patrol duty because her duty belt weighed more than 20 pounds. (Pl.'s Dep. at 105–106; Dr. Fagan's Note, Ex. P to Def.'s 56(a)1 Stmt.) Chief Manzi assigned her to "light duty" work at police headquarters (Pl.'s Dep. at 108), but Ms. Reynolds wanted only daytime "light duty" shifts. The light duty policy did not limit such assignments to daytime shifts. (*See* Pl.'s Dep. at 112–14.)

Also on March 26, 2009, when Ms. Reynolds learned that she was going to be interviewed as part of the IA investigation (*id.* at 209), she requested more time prior to being interviewed "in order to seek proper union representation." (*Id.* at 213:18–21.) Chief Manzi contacted the union president, Officer Dabkowski about the forthcoming IA interview (*id.* at 76–77), but prior to Officer Dabkowski's arrival, Ms. Reynolds decided that she would start the interview, and signed a written waiver of her right to have a union representative present. (*Id.* at 84–85; Waiver of Union Representation, Ex. N to Def.'s 56(a)1 Stmt.) Although the waiver states that "I sign this waiver of my own free will under no threats or promises," Ms. Reynolds contends that she was made to sign it under duress. (Pl.'s Dep. at 84:18–22.) Ms. Reynolds also signed a notice stating that she had received and

4

understood her Garrity rights, and that she had the right to have a union representative present with her at the IA interview. (Ex. O to Def.'s 56(a)1 Stmt at 2.)

Officer Dabkowski arrived shortly after the interview started, and the meeting was paused so that Ms. Reynolds could speak with him. (*Id.* at 87:23–24.) Ms. Reynolds testified that she spoke with him for no more than "two minutes," as their "conversation was cut short by Lieutenant Huntley who came into the kitchen and said, 'Let's go.'" (*Id.* at 88:1–5.)

On March 31, 2009, Ms. Reynolds contacted Captain Bourque to tell him that her doctor recommended that she stay home for the rest of the day. (*Id.* at 116–17.) Captain Bourque requested a call from Ms. Reynolds's physician (*id.* at 119), and then told her that she could "go home, but [she] would not be getting paid" (*id.* at 119:16–17), because she had no remaining sick days (*id.* at 119:25–120:8).

The IA investigation "substantiated violations of the Rules of Conduct pertaining to 1.02 Conduct Unbecoming, 1.07 Fictitious Illness or Injury, 1.38 Truthfulness, and 1.40 Accountability, Responsibility and Discipline." (IA Investigation, Ex. Q to Def.'s 56(a)1 Stmt; Manzi Memo, Ex. R.) On April 15, 2009, Ms. Reynolds accepted a 30–day suspension related to the February 20, 2009 events and negotiated a "Last Chance Agreement" in which she agreed to release "any claims related to the investigation in this internal investigation," including grievances under 42 U.S.C. § 1981, 1983; Title VII, the ADA, and the CHRC. (Last Chance Agreement, Ex. T to Def.'s 56(a)1 Stmt ¶ 9.)

C.     Short–term Disability Request, and Warrant Detail Assignment

Ms. Reynolds contacted Joyce Feeney, the HR Director to request short–term disability leave to which she believed she was entitled. (Pl.'s Dep. at 132–33.) Ms. Feeney did not submit any claim statement, because she believed that short–term disability was only

available to employees who were completely unable to work, rather than employees who only had some work restrictions, like Plaintiff. (Feeney Dep., Ex. G to Def.'s 56(a)1 Stmt at 14-15; 21–22.) Ms. Reynolds met with Chief Manzi to request that she be allowed to work day shifts (*id.* at 139), which he agreed to, and Ms. Reynolds was assigned to work day shifts on a warrant detail, under the supervision of Sergeant Brown.[2] (*Id.* at 144, 146.)

For her warrant detail, Ms. Reynolds was taught to use the ISO ClaimSearch database, an insurance database that holds individuals' personal information. (Brown Dep., Ex. F at 58–60.) On June 10, 2009, during an eight-hour work shift, Ms. Reynolds used the ISO ClaimSearch database to access information on Sergeant Van Tasel, the investigating officer assigned to her IA investigation. (Pl.'s Dep. at 147–48; July 14, 2009 Internal Investigation, Ex. V to Def.'s 56(a)1 Stmt.) This search did not pertain to her warrant detail assignment, and an audit of the ISO ClaimSearch database revealed that Ms. Reynolds had spent over an hour searching for records on Van Tasel. (ISO ClaimSearch Audit Report, Ex. W.) Ms. Reynolds maintains that the information that she obtained through the ISO ClaimSearch database was public information. (Pl.'s Aff., Ex. 2 to Pl.'s 56(a)2 Stmt ¶ 53.)

On July 3, 2009. Ms. Reynolds complained to Chief Manzi that Van Tasel had been involved in three motor vehicle accidents,[3] that the accidents had been "covered up," and

---

[2] Ms. Reynolds eventually provided medical documentation that she needed to work only day shifts on June 18, 2009. (*See* June 18, 2009 Letter from Dr. Quinlan, Ex. X to Def.'s 56(a)1 Stmt.)

[3] Sergeant Van Tasel was involved in three one-car motor vehicle accidents. Chief Manzi testified that all three of the accidents were investigated by the state police or another local department. (Manzi Dep. at 34–35.) The first accident occurred in Enfield, and alcohol may have been involved, though Sergeant Brown believes that Van Tasel passed the field sobriety test, since he was released to Sergeant Brown and driven home. (Brown Dep., Ex. F at 97–99; Bourque Dep., Ex. E at 111–13.) The second accident occurred in Somers (*see*

6

that she had been treated differently and received more serious discipline than he had (Pl.'s Dep. at 157–59, 167–68, 170–71, 214–16), in part due to her gender. (*Id.* at 171:11–12.) Accordingly to Ms. Reynolds, Chief Manzi became very defensive once she raised the issue of gender and differential treatment. (Pl.'s Aff. ¶ 58.)

On July 8, 2009, Chief Manzi informed Plaintiff that an IA investigation had been opened regarding her use of the ISO ClaimSearch database and that her use of the database to access Sergeant Van Tasel's personal information constituted a violation of a criminal statute (Manzi Dep. at 107–08), which, if "sustained, violated Connecticut General Statute Sec. 53a-254, Computer Crime in the Third Degree, which is a class D felony" (Ex. Z), and that her actions violated her Last Chance Agreement (*id.*).

Ms. Reynolds was offered the opportunity to resign rather than being terminated, and Chief Manzi advised her that she had 24 hours to consider this offer. (*Id.*) Ms. Reynolds discussed this with her union attorney and with private counsel (Pl.'s Dep. at 182), and resigned her position the next day (Letter of Resignation, Ex. AA to Def.'s 56(a)1 Stmt). Ms. Reynolds contends that she was forced to resign under duress, and that the Town represented at an August 2009 Department of Labor hearing that she was discharged for

---

Jan. 1, 2006 Accident Report, Ex. BB to Def.'s 56(a)1 Stmt), and Van Tasel struck a CL&P pole. Sergeant Van Tasel called to report the accident to Lieutenant Huntley, who then reported it to Captain Bourque. (Bourque Dep. at 118–19; Brown Dep. 101–102.) The investigating state trooper issued Van Tasel a warning for "traveling too fast for conditions" (Ex. BB; Ex. CC at 16.) The third accident occurred in Somers (May 9, 2009 Accident Report, Ex. DD to Def.'s 56(a)1 Stmt), and occurred approximately a half mile from Van Tasel's home. (*See id.*; *see also* Manzi Dep. at 41–42.) Chief Manzi "counseled" Sergeant Van Tasel, because "[t]he third event rose [sic] a red flag that you have to be counseled in regard to this matter." (Manzi Dep. at 44:24–25.) No disciplinary action was taken, though "as a result of his counseling, a department–wide refresher course in defensive driving tactics" was ordered. (*Id.* at 45:3–7.)

willful misconduct. (Pl.'s Aff., Ex. 2 to Pl.'s 56(a)2 Stmt ¶ 17.) HR Director Joyce Feeney testified at her deposition that she had determined, based on Chief Manzi's description of Plaintiff's actions, that Ms. Reynolds's departure from the department was due to willful misconduct and had concluded that Ms. Reynolds was not entitled to COBRA benefits. (Feeney Dep., Ex. 45 to Pl.'s 56(a)2 Stmt at 44:11–23.)

### E. Sexual Harassment Allegations

Ms. Reynolds testified that between March 2007 and January 2009, she was sexually harassed by Lieutenant Huntley. (Pl.'s Dep. at 187–88.) Chief Manzi denies that he was ever advised of any inappropriate conduct by Huntley. (Manzi Dep. at 135–37.) At some point in 2009, Ms. Reynolds reported to Sergeant Brown that she felt Lieutenant Huntley was "following her around" with the new GPS system. (Brown Dep., Ex. F to Def.'s 56(a)1 Stmt at 116:16–17.) Sergeant Brown testified that he thought Ms. Reynolds was observing that she felt like "big brother is always watching you" (*id.* at 117:1–4), and that she never discussed with him any incidents that she believe to constitute sexual harassment or inappropriate behavior by Lieutenant Huntley. (*See id.* at 116.)

II.   Discussion[4]

Plaintiff brings her claims against the Town of Suffield and against the individual Defendants under Title VII for disparate treatment due to her gender and her pregnancy, under the ADA and the Rehabilitation Act on account of her pregnancy, and under Conn. Gen. Stat. § 31-51q for retaliating against her for exercising her First Amendment rights. Defendants move for summary judgment on all counts.

As an initial matter, the individual Defendants Manzi, Lingenfelter, Miner, Bourque, Brown, and Feeney seek dismissal of the federal and state statutes against them, which Plaintiff does not oppose. These statutes do not provide for individual liability: *see Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (Title VII); *see Kennedy v. St. Francis Hosp.*, 225 F. Supp. 2d 128, 144 (D. Conn. 2002) (the ADA); *Diggs v. Town of Manchester*, 303 F. Supp. 2d 163, 175 (D. Conn. 2004) (the Rehabilitation Act); *Burdick v. Clouet*, CV085006062, 2011 WL 2739557 (Conn. Super. Ct. June 14, 2011) (Conn. Gen. Stat. § 31-51q). Thus, the individual Defendants' motions seeking dismissal of the claims against them are granted.[5]

---

[4] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir.2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000).

[5] Although Plaintiff consents to the granting of summary judgment on her sexual harassment claim (Pl's Mem. Opp'n [Doc. # 46] at 24), she maintains that her reporting of Lieutenant Huntley's sexual comments was "protected speech" for the purposes of her § 31-

A.     Differential Treatment under Title VII

Plaintiff argues that she was subjected to unlawful disparate treatment in violation of Title VII. To establish a prima facie case of sex discrimination, she must prove: (1) membership in a protected class; (2) qualification for her position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of her membership in the protected class. *See Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000); *Christy v. Ken's Beverage*, Inc., 660 F. Supp. 2d 267, 273 (D. Conn. 2009). Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, non–discriminatory reason for its action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

Although Defendants do not dispute that Plaintiff has established the first two elements of her *prima facie* case—that she is a woman and was pregnant at the time of her termination/resignation, and she was qualified for her position—Defendants dispute that Plaintiff suffered an adverse employment action and that the factual record would support an inference of discrimination.

   1.     *Adverse Employment Action*

Ms. Reynolds claims two adverse employment actions: (1) her forced resignation in July 2009 and (2) the disciplinary action taken against her for the February 2009 off–duty incident. (Pl.'s Mem. Opp'n at 18.) An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Weeks v. New York State*, 273 F.3d 76, 85 (2d Cir. 2001).

---

51q claim.

As to the disciplinary action taken against Ms. Reynolds as a result of the February 2009 off–duty incident, it appears that in signing the Last Chance Agreement Plaintiff expressly released any claims of discrimination related to the police department's investigation of that incident and her 30–day suspension. (*See* Ex. F to Def.'s 56(a)1 Stmt.) Plaintiff does not dispute the validity of her Last Chance Agreement and the release of claims contained in it, and thus, her 30–day suspension and discipline as a result of the off–duty incident in February 2009 may not be claimed for the purposes of her *prima facie* case. However, her "forced resignation" claim can constitute an adverse employment action, i.e., a "materially adverse change" in the terms and conditions of her employment with the Town of Suffield, and this claim was not subject to any waiver.

### 2. *Inference of Discrimination*

Defendants contend that even considering the forced resignation as an adverse employment action, Ms. Reynolds cannot make out a prima facie case because there is no evidence to suggest an inference of discrimination.

Ms. Reynolds points to the different treatment that she received for her off–duty misconduct as compared with how the department addressed Sergeant Van Tasel's three off–duty motor vehicle incidents as evidence giving rise to an inference of discrimination. Defendant argues that Sergeant Van Tasel and Plaintiff are not similarly situated "in all material respects," and thus that she cannot compare her treatment with Sergeant Van Tasel's.

The Second Circuit has held that what constitutes "all material respects" varies from case to case and must be judged based on "(1) whether the plaintiff and those [she or] he maintains were similarly situated were subject to the same workplace standards and (2)

11

whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham v. Long Island RR*, 230 F.3d 34, 39–40 (2d Cir. 2000). Here, although Ms. Reynolds, a sworn officer, and Mr. Van Tasel, a sergeant, were subject to the same workplace standards at the Suffield Police Department only until the Last Chance Agreement was put in place, the record does not create a genuine issue of fact as to whether their conduct was "of comparable seriousness."

The off–duty incident that occurred after Plaintiff called in sick violated Section 1.07 of the Rules of Conduct:

> Employees shall not feign illness or injury, falsely report themselves ill or injured, or otherwise deceive or attempt to deceive the Department as to the condition of their health.

(Rules of Conduct, Ex. S to Def.'s 56(a)1 Stmt.) As to the Plaintiff's use of the ISO ClaimSearch database to research Sergeant Van Tasel's accident history, the Rules of Conduct state, in pertinent part:

Section 1.20 Abuse of Position

C. Employee are prohibited from using information gained through their position as law enforcement employees to improve their financial position or to advance the private interests of themselves or others.

Section 1.33 Intervention

A. Employees shall not knowingly interfere with Departmental functions being handled by other employees of the Department or any other governmental agency unless, ordered to intervene by a Supervisor; and or the intervening employee reasonably believes that a manifest injustice would result from failure to take action.

>   B.   Employees shall not undertake any investigation or other official action that is not part of their regular duties without obtaining permission from a supervisor unless the exigencies of the situation require immediate action. Any investigation, criminal or otherwise, being surreptitious in nature shall only be conducted with the Chief's approval.

(*Id.*) When Plaintiff was terminated for her unauthorized use of the ISO ClaimSearch database, she was working under a Last Chance Agreement and she was no longer subjected to the same workplace standards as others in the department. Thus, the record does not support Plaintiff's contention that Sergeant Van Tasel is a similarly situated individual.

Because Plaintiff cannot make out a *prima facie* case of sex discrimination based on differential treatment, Defendants are entitled to summary judgment on Plaintiff's Title VII claim.

>   B.   Disability Discrimination under the ADA and the Rehabilitation Act

Plaintiff next asserts that she was subjected to unlawful discrimination on account of her disability—her pregnancy—under the ADA and the Rehabilitation Act. However, it is well settled that pregnancy is not a disability *per se* under the ADA. *See, e.g., Martinez v. N.B.C., Inc.*, 49 F. Supp. 2d 305, 308 (S.D.N.Y. 1999) ("Every court to consider the question to date has ruled that 'pregnancy' and related medical conditions do not, *absent unusual conditions*, constitute a [disability] under the ADA.") (emphasis added); *Wenzlaff v. NationsBank*, 940 F. Supp. 889, 890 (D. Md. 1996) ("With near unanimity, federal courts have held that pregnancy is not a 'disability' under the ADA."). Thus, absent more, the simple fact that Plaintiff was pregnant is insufficient to demonstrate that she was "disabled," that is, had a "physical or mental impairment which substantially limit[ed] one or more of [her] major life activities" within the meaning of the ADA and the Rehabilitation Act.

Even if the Court were to consider the caveat that "unusual conditions" of pregnancy could satisfy the definition of "disability," Plaintiff has not provided evidence of conditions giving rise to a physical impairment that substantially limited one or more of her major life activities. The record shows that her physician provided a note which stated that she was not to lift more than 20 pounds while at work (*see* Ex. P to Def.'s 56(a)1 Stmt), and in June, her physician provided another note which stated that Ms. Reynolds should work only during the day shifts (Ex. X to Def.'s 56(a)1 Stmt).

To be substantially limited in her ability to work, as Plaintiff claims she was, she would need to show that she was "precluded from more than one type of job, a specialized job, or a particular job of choice." *Pare v. City of Bnstol*, 386 F. Supp. 2d 43, 39 (D. Conn. 2005); *see also* 29 C.F.R. § 1630.2(j)(3)(i) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."). Neither of the doctor's notes, nor Plaintiff's own testimony, suggest that she was restricted from performing a class of jobs or a broad range of jobs, only that she was precluded from some lifting associated with patrol duty, and the undisputed record shows that Plaintiff was promptly taken off patrol duty as soon as this pregnancy limitation was made known to Captain Bourque.

Thus, because the record fails to show Plaintiff's argument that she could be found to be "disabled" within the meaning of the ADA and Rehabilitation Act as a result of her pregnancy, Defendants are entitled to summary judgment on these claims.

C. Protected Speech under Conn. Gen. Stat. § 31-51q

Finally, Plaintiff claims that she was engaged in protected speech when she complained to Chief Manzi about Lieutenant Huntley's sexual comments and about Sergeant Van Tasel's accidents.

Conn. Gen. Stat. § 31-51q states:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.

Defendants argue that summary judgment is proper on this count because the speech protected by the statute must pertain to an issue of public concern, and under *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), is not protected and was made pursuant to the speaker's official duties.

Plaintiff testified at her deposition that she believed that it was her "duty" as an officer in the Suffield Police Department "to make the complaint [regarding Sergeant Van Tasel's accidents] to Chief Manzi." (Pl.'s Dep. at 168:7–18.) Plaintiff's concession that this was part of her official duties renders this speech unprotected by the First Amendment. *See Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might

15

have enjoyed as a private citizen."); *see also Perez-Dickson v. City of Bridgeport*, 304 Conn. 483, 497–98 (2012) ("The plaintiff [a public school principal] does not . . . claim that she was not speaking pursuant to her official duties . . . . Accordingly, it is undisputed that the plaintiff's claim that the defendants had violated § 31-51q by disciplining her for exercising her rights under the first amendment is barred by *Garcetti.*"). Thus, as Plaintiff complained to Chief Manzi about Sergeant Van Tasel pursuant to her official duties, her complaint is not protected speech under Conn. Gen. Stat. § 31-51q.

As to Plaintiff's complaints of sexual harassment, "[w]hether the subject matter addressed by a particular statement is of public concern involves a question of law for the court," and "depends on its content, its form, and the context in which it is made. This latter inquiry necessarily involves a question of fact." *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 777 (1999). "The court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it has a broader public purpose." *Lewis v. Cowen*, 165 F3d 154, 163–64 (2d Cir. 1999).

Plaintiff testified that she reported the harassment to Chief Manzi, which he disputes. When asked what "specifically" she brought to the Chief's attention, Plaintiff testified, "[t]he inappropriate pet names that he was using, the phone call that he made to me shortly after my surgery." (Pl.'s Dep. at 191:14–17.) Plaintiff also testified that after this conversation, she never reported any additional incidents of harassment to Chief Manzi or Captain Bourque, though Plaintiff stated that the harassing behavior continued. (*Id.* at 194:5–8, 193:2–15.) Viewing the record in the light most favorable to Plaintiff, a reasonable jury would find that her complaint to Chief Manzi pertaining to Lieutenant Huntley's behavior was "calculated to redress personal grievances," rather than finding that it was motivated by public concern

or a "broader public purpose." Therefore, these statements cannot constitute protected speech under Conn. Gen. Stat. § 31-51q.

III.     Conclusion

For the reasons discussed above, Defendants' motion [Doc. #37] for summary judgment is GRANTED in its entirety.  The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of July, 2012.